IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

**MELISSA CLUTTER-JOHNSON,**

     **Plaintiff,**

**v.**                                **CIVIL ACTION NO. 1:16-cv-**4041_____

**UNITED STATES OF AMERICA**

     **Defendant.**

## COMPLAINT

NOW COMES Plaintiff Melissa Clutter-Johnson, by counsel R. Dean Hartley, Mark R. Staun, David B. Lunsford, and Hartley and O'Brien, PLLC, and for her Complaint against Defendant United States of America (herein sometimes referred to as "United States") states as follows:

### PARTIES AND JURISDICTION

1.     Plaintiff, Melissa Clutter-Johnson, is a citizen and resident of Princeton, Mercer County, West Virginia.

2.     Plaintiff brings the instant action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*

3.     Prior to filing the instant Complaint, Plaintiff complied with the respective requirements of the West Virginia Medical Professional Liability Act, W. Va. Code § 55-7B-1, *et seq.* ("MPLA") and the FTCA:  In respect to the MPLA, Plaintiff provided a Notice of Claim to Marcia A. Khalil, M.D. (hereinafter sometimes referred to as Dr. Khalil"), Gina Jereza-Harris, M.D. (hereinafter sometimes referred to as "Dr. Jereza-Harris"), and Community Health Systems, Inc., d/b/a Access Health-OB/GYN (hereinafter sometimes referred to as "Access

Health – OB/GYN" or simply "Access Health"). *See* Ex. 1.   Plaintiff presented two administrative claims, one on her own behalf and one on behalf of her daughter, G.E.J.[1], by Standard Form 95s, to the Department of Health and Human Services ("DHHS").  *See* Ex. 2 attached hereto.  Thereafter, Plaintiff provided a Certificate of Merit to each of the above-named healthcare providers as well as to the Department of Health and Human Services.  *See* Ex. 3. DHHS reviewed the adminsitrative claims, and ultimately, in a letter dated December 28, 2015, *see* Ex. 4, DHHS denied each of the filed administrative claims.  As such, Plaintiff properly complied with the requirements of the MPLA and properly exhausted the administrative remedy process provided by 28 U.S.C. § 2675 and now brings the instant action within six months of such final agency denial.

4.     Access Health-OB/GYN is a federally-funded facility under the terms of the Federally Supported Health Centers Assistance Acts; additionally, Drs. Khalil and Jereza-Harris are deemed employees of the United States under federal law; and as result of the alleged negligence of Drs. Khalil and Jereza-Harris, occurring within the course and scope of their employment, the FTCA applies and the United States is substituted as the sole Defendant in this civil action.

5.     Marcia A. Khalil, M.D. is a medical doctor specializing in the field of Obstetrics and Gynecology, whose primary work location is 410 Carriage Drive, Beckley, West Virginia 25801.

6.     Gina Jereza-Harris, M.D. is a medical doctor specializing in the field of Obstetrics and Gynecology, whose primary work location is 410 Carriage Drive, Beckley, West Virginia 25801.

---

[1] Initials are used herein to protect the identity of Plaintiff's minor children.

7. Community Health Systems, Inc., d/b/a Access Health-OB/GYN is a West Virginia, non-profit, corporation with the Agent of Service of Process being Dennis L. Cook. As described above, Access Health is a federally-funded facility pursuant to the terms of the Federally Supported Health Centers Assistance Acts. Access Health's principal place of business is 252 Rural Acres Drive, Beckley, WV 25801.

8. Plaintiff Melissa Clutter-Johnson received medical treatment, including but not limited to placement of a Mirena® intrauterine device (hereinafter sometimes referred to as "IUD"), from Defendant's employees or agents, and that treatment along with Plaintiff's subsequent pregnancy forms the basis of Plaintiff's Complaint.

9. Jurisdiction is proper as jurisdiction is exclusive, for tort actions brought against the United States under the FTCA, in the appropriate United States District Court based upon where the alleged acts and/or failures to act giving rise to the action occurred, in the instant case, the United States District Court for the Southern District of West Virginia. Venue is proper as an action brought under the FTCA may be prosecuted in the judicial district in which the Plaintiff resides, in the instant case, the Bluefield Division of the United States District Court for the Southern District of West Virginia.

## OPERATIVE FACTS

10. Plaintiff gave birth to a baby girl by vaginal delivery on August 8, 2009 at Raleigh General Hospital.

11. Plaintiff had a Mirena® IUD placed on September 28, 2009.

12. The September 28, 2009 IUD placement (hereinafter sometimes referred to as "IUD placement") was performed at Access Health-OB/GYN, which is located at 410 Carriage Lane, Beckley, West Virginia 25801.

13. During the September 28, 2009 IUD placement, Beth Ross, CNM, who, upon information and belief, is/was an employee and/or agent of Community Health Systems, Inc., and/or the United States of America, acting within the course and scope of her employment, made two unsuccessful attempts at inserting the IUD.

14. Such unsuccessful insertions caused a "false track" insertion into the distal cervix and the lower uterine segment subserosal myometrium.

15. Thereafter, Dr. Khalil and/or Lyn Haley, CNM improperly placed the IUD.

16. Notwithstanding the difficulties with insertion of the IUD, no ultrasound, MRI, or other standard diagnostic testing was performed to ensure proper placement of the IUD.

17. When properly placed, Mirena® IUDs are more than 99 percent effective at preventing pregnancy.

18. When not properly placed, Mirena® IUDs are significantly less effective at preventing pregnancy.

19. The Mirena® IUD is designed to prevent pregnancy for up to five (5) years when properly placed.

20. In September 2012, Plaintiff became pregnant with twin daughters.

21. On October 24, 2012, Plaintiff presented to Access Health. Her Chief Complaint from the appointment as reflected in her medical record was "pregnant with IUD[.]"

22. In the HPI in the medical notes from the October 24, 2012 Access Health appointment, Dr. Jereza-Harris notes the following

> The IUD strings are easily visualized. Removal was first attempted by D. Crowder, then I attempted removal. Both attempts were unsuccessful, the IUD appears to be lodged. I grasped the strings w[ith] a kelly clamp, using gentle and firm traction attempted to remove the IUD. One of the strings broke.

> The [M]irena was not visualized on exam, even with a cervical spreader in place.
>
> [T]he patient was sent to u[ltrasound], which showed the IUD in the lower uterine segment.  FHB present x 2.  Due to the difficulty in removing the IUD, I suspect it may be imbedded in the uterine wall.  I consulted Dr. Chaffin by phone, he suggests an MRI.
>
> Dr. Chaffin recommends that if the IUD is imbedded, the strings should be cut as short as possible and the [M]irena should be left in place.  If it is in the abdomen, laparoscopy could be done to remove it.
>
> The p[atient] understands there is a 50% chance of pregnancy loss in the second trimester if the IUD is left in place.

23.    On November 6, 2012, Plaintiff presented to Webster County Memorial Hospital where a pelvic MRI was performed.

24.    Thereafter, on November 14, 2012, Plaintiff, based on Dr. Jereza-Harris' referral, sought consultation from David Chaffin, M.D. (herein sometimes referred to as "Dr. Chaffin") at Cabell Huntington Hospital in Huntington, West Virginia.

25.    In relevant part, Dr. Chaffin's Consultation notes from the November 14, 2012 appointment state as follows

> The location of the IUD entirely within the cervical canal, associated with the extreme difficulty with attempts at removal (breaking strings twice) leads me to conclude that the IUD was placed ONLY within the canal initially and that the arms of the IUD had no opportunity to extend.  Now, attempts at removal results in the arms extending and preventing removal.  However, this also suggests that the IUD has not become embedded and if cervical dilation occurs the IUD may actually fall out.

26.    Following Dr. Chaffin's consultation, Plaintiff underwent a normal course for the remainder of her pregnancy.

27.    No defects were noted for either of the twins based on numerous biophysical profiles and ultrasounds performed during the course of the pregnancy.

28.     On May 10, 2013, at Raleigh General Hospital, Plaintiff underwent a caesarian section surgery at the hands of Dr. Jereza-Harris and Dr. Khalil.

29.     According to the Raleigh General Hospital Operative Report, the "PROPOSED PROCEDURE" was "Low transverse primary cesarean section, bilateral partial salpingectomy, location of IUD.  The actual "PROCEDURE PERFORMED" was "Low transverse primary cesarean section, bilateral partial salpingectomy, inability to find the IUD."

30.     On May 10, 2013, I.A.J. was born via cesarean section at approximately 8:21 am.

31.     On May 10, 2013, G.E.J. was born via cesarean section at approximately 8:22 am.

32.     I.A.J. suffers from no congenital defects and is a normal, healthy child.

33.     At the moment of birth, it was not apparent that G.E.J. suffered from congenital defects.  However, several days after her birth, it became apparent that G.E.J. suffered from congenital defects.

34.     Ultimately, G.E.J. was diagnosed with a number of congenital defects, including but not limited to, Duane Syndrome, congenital scoliosis, ventricular septal defect, and cranial nerve defect.  As a result of these congenital defects, G.E.J. has undergone, and continues to undergo, a complicated medical course, which has included surgery.

35.     Despite Drs. Khalil and Jereza-Harris being present for both cesarean section deliveries performed on May 10, 2013, and being aware of the lodged IUD, Drs. Khalil and Jereza-Harris failed to locate and remove the IUD during the May 10, 2013 cesarean section procedure.

36.     As a result of Drs. Khalil and Jereza-Harris failing to remove the lodged IUD during the May 10, 2013 cesarean section procedure, Plaintiff underwent a complicated medical

course following her delivery of the twins, which has included surgery as discussed in more depth herein.

37.     On July 1, 2013, Plaintiff presented to Access Health for a post-partum visit with Dr. Khalil.  The HPI from this visit states, in relevant part, "[s]he conceived with IUD in place.  IUD was imbedded and at the time of the C-section, after careful exploration, the IUD was not located."  Moreover, the Assessment section of the medical records from the July 1, 2013 appointment note "Lost IUD."

38.     On July 1, 2013, Dr. Khalil ordered a pelvic X-ray for Plaintiff and ordered Plaintiff to return annually, so long as her July 1, 2013 pap smear and X-ray were normal.

39.     On July 2, 2013, Plaintiff presented to Webster County Memorial Hospital where she was examined by James Carrico, M.D. (hereinafter sometimes referred to as "Dr. Carrico").  The clinical indication of the medical record is "IUD malfunction."  In the discussion, Dr. Carrrico notes that "[a]n IUD is projected over the lower right sacrum within the expected location of the central pelvis.  Consider a pelvis ultrasound to further localize the IUD if clinically warranted."

40.     On July 31, 2013, Plaintiff presented to Webster County Memorial Hospital where she was examined by Joseph Skeens, M.D. (hereinafter sometimes referred to as "Dr. Skeens").  The Clinical Indication in the medical record is "Status post pregnancy with IUD."  The Discussion, in relevant part, states as follows

> Transabdominal and transvaginal pelvic ultrasound examinations were performed.
>
> The uterus measures 6.8 x 4.8 6.3 cm with endometrium measuring 0.8 cm with a hyperechoic area within the uterus which appears to be located in the inferior aspect of the uterus and likely represents the IUD which is not optimally demonstrated on these images but appears to be inferiorly displaced and does not appear to be in

optimal position. I would recommend clinical correlation by the
patient's treating gynecologist.

As noted in the medical record, the Impression, in relevant part, is as follows: "There is
an echogenic structure in the uterus which appears to represent the IUD which appears to be
located inferiorly and may not be in optimal position. I recommend clinical correlation by the
patient's treating gynecologist."

41.     On August 13, 2014, Plaintiff presented to Joe Ellington, M.D. (hereinafter
sometimes referred to as "Dr. Ellington") for a Routine Gynecological Examination and
requesting to have the still lodged IUD removed.

42.     On August 26, 2014, Plaintiff presented to Dr. Ellington for removal of the lodged
IUD. Dr. Ellington's attempt to remove the IUD was unsuccessful. In the Procedure Note, Dr.
Ellington notes "[u]nable to reach IUD, USN performed IUD at fundus, will need to go to D&C
hysteroscopic removal." Accordingly, a subsequent procedure was scheduled.

43.     On September 15, 2014, Plaintiff presented to Princeton Community Hospital for
a surgical IUD Removal with Dr. Ellington. The preoperative and postoperative diagnoses were
"[e]mbedded intrauterine device in the myometrium." The notes concerning "Procedure
Performed" state as follows: "Dilation of cervix with hysteroscopy, attempted removal of
intrauterine device under fluoroscopy."

44.     The Operative Report from September 15, 2014 states as follows, in relevant part,

**INTRAOPERATIVE FINDINGS:**
Suggested nothing in the intrauterine cavity. Fluoroscopy
suggested IUD either in the myometrium or outside the uterus. We
were unable to identify the end of the IUD from an intrauterine
evaluation.

**PREOPERATIVE CONSIDERATIONS:**
The patient is a 36-year-old gravida 5, para 4, AB 1 white female
status post tubal ligation who had an embedded IUD at the fundus.

8

She was in for removal of the IUD. The patient had not been experiencing any significant pain as far as we are aware of. We were unable to get the IUD out at the office. Ultrasound suggested it was also higher up in the uterus. The patient was consented for hysteroscopy and dilation and possible curettage for hysteroscopic removal of the IUD. The patient was consented previously and again the day of the surgery.

**DESCRIPTION OF PROCEDURE**
The patient was brought back to the operating room, placed under general anesthesia per Dr. Ball, prepped and draped in the usual fashion. Exam under anesthesia revealed midline uterus slightly retroverted without any problems. IUD string was not palpable. I tried to use a polyp forceps initially into the cervical canal to get ahold of the IUD and remove it and that was unsuccessful. I then dilated the cervix to Heaney #20 Pratt dilator without any problems and looked in with the hysteroscope, I was unable to see and [sic] IUD in the intrauterine cavity. Both ostia were noted. Anteriorly, there was the possibility of an area that had healed over, we do not know if that was the IUD or not. We did have fluoroscopy come in and take a look and as best we could tell at the end of the probe and hysteroscope where the IUD should be, however, we do not know if it was outside of the myometrial wall into the abdominal cavity or not, but it definitely was not located. The decision was made to conclude the procedure.

45. On December 3, 2014, Plaintiff presented to Princeton Community Hospital for a surgical IUD removal with Dr. Ellington. The Preoperative Diagnosis was "[e]mbedded intrauterine device in fundus, pelvic pain on the right side particularly." During the December 3, 2014 procedure a diagnostic laparoscopy was performed and the embedded IUD was removed once it was located.

### COUNT I
### NEGLIGENCE OF MARCIA A. KHALIL, M.D.

46. Plaintiff incorporates all allegations above the same as if fully restated and re-alleged and Plaintiff further complains and says as follows:

47. At all times relevant hereto, Marcia A. Khalil, M.D. was a deemed federal employee who was acting within the course and scope of her employment.

48.     The standard of care required Marcia A. Khalil, M.D. and/or Lyn Haley, CNM to properly insert the IUD into the long axis of the dilated canal.

49.     The standard of care required Marcia A. Khalil, M.D. and/or Lyn Haley, CNM to order standard diagnostic imaging such as ultrasound or MRI, in order to ensure proper IUD placement, after encountering difficulties with insertion of the IUD.

50.     The standard of care required Marcia A. Khalil, M.D. to locate and remove the IUD during the cesarean section procedure on May 10, 2013.

51.     Marcia A. Khalil, M.D. breached the standard of care when she failed to properly insert the IUD and/or failed to order standard diagnostic imaging such as ultrasound or MRI and subsequently modify the original placement of the IUD.

52.     Marcia A. Khalil, M.D. breached the standard of care when she failed to locate and remove the IUD during the cesarean section procedure on May 10, 2013.

53.     As a direct and proximate result of Marcia A. Khalil, M.D.'s negligence, Plaintiff became pregnant with twin daughters, one of whom is a normal, healthy child and one of whom suffers from several congenital defects.

54.     As a direct and proximate result of Marcia A. Khalil, M.D.'s negligence, Plaintiff underwent a complicated medical course and suffered multiple unnecessary surgeries.

55.     As a direct and proximate result of Marcia A. Khalil, M.D.'s negligence, Plaintiff has suffered economic damages, including but not limited to lost earnings and medical expenses, related to, *inter alia*, prenatal care, childbirth, and postnatal care.

56.     As a direct and proximate result of Marcia A. Khalil, M.D.'s negligence, Plaintiff has suffered and will continue to suffer enormous pain and suffering, physically, mentally, and emotionally.

57.      As a direct and proximate result of Marcia A. Khalil, M.D.'s negligence, Plaintiff has suffered economic damages and will continue to suffer economic damages as a result of her child, G.E.J., being born with congenital defects; accordingly, Plaintiff has suffered and will continue to suffer the costs of correcting the defects and the costs of extraordinary child care arising from the defects, potentially into G.E.J.'s majority.

58.      Marcia A. Khalil, M.D.'s failure to follow the accepted standard of care deprived Plaintiff of a chance of not becoming pregnant and/or increased the risk of Plaintiff becoming pregnant.

## COUNT II
### NEGLIGENCE OF GINA JEREZA-HARRIS, M.D.

59.      Plaintiff incorporates all allegations above the same as if fully restated and re-alleged and Plaintiff further complains and says as follows:

60.      At all times relevant hereto, Gina Jereza-Harris, M.D. was a deemed federal employee who was acting within the course and scope of her employment.

61.      The standard of care required Gina Jereza-Harris, M.D. to locate and remove the IUD during the cesarean section procedure on May 10, 2013.

62.      Gina Jereza-Harris, M.D. breached the standard of care when she failed to locate and remove the IUD during the cesarean section procedure on May 10, 2013.

63.      As a direct and proximate result of Gina Jereza-Harris, M.D.'s negligence, Plaintiff underwent a complicated medical course and suffered multiple unnecessary surgeries.

64.      As a direct and proximate result of Gina Jereza-Harris, M.D.'s negligence, Plaintiff has suffered economic damages, including but not limited to medical expenses and lost earnings.

65.     As a direct and proximate result of Gina Jereza-Harris, M.D.'s negligence, Plaintiff has suffered and will continue to suffer enormous pain and suffering, physically, mentally, and emotionally.

### COUNT III
### VICARIOUS LIABILITY OF ACCESS HEALTH – OB/GYN

66.     Plaintiff incorporates all allegations above the same as if fully restated and re-alleged and Plaintiff further complains and says as follows:

67.     Community Health Systems, Inc. is vicariously liable for its employees and/or agents including but not limited to, Marcia A. Khalil, M.D.'s; Gina Jereza-Harris, M.D.'s; Beth Ross, CNM's; and Lyn Haley, CNM's acts and/or failures to act and negligence as detailed herein.

68.     Community Health Systems, Inc. is the employer of and/or principal in an agency relationship with Marcia A. Khalil, M.D.; Gina Jereza-Harris, M.D.; Beth Ross, CNM; and Lyn Haley, CNM.

69.     As discussed above, due to Community Health Systems, Inc. receiving federal funds and Drs. Khalil, Jereza-Harris, and presumably the other employees and/or agents of Community Health Systems, Inc., being deemed federal employees whose alleged negligence occurred during the course and scope of their employment, it is proper to substitute the United States as the sole Defendant in this civil action brought under the FTCA.

WHEREFORE, Plaintiff demands compensatory damages from Defendant United States in an amount to be determined by the trier of fact, not in excess of the sum-certain demand contained in her administrative demand attached as an exhibit hereto.  Plaintiff further demands post-judgment interest, any other damages permitted under the West Virginia Medical

Professional Liability Act, W. Va. Code § 55-7B-1, *et seq.* and the Federal Tort Claims Act, and

any other relief deemed fair and just which she may be entitled to receive.

PURSUANT TO THE FTCA, PLAINTIFF DEMANDS A BENCH TRIAL.

**MELISSA CLUTTER-JOHNSON,**

**Plaintiff,**

/s/ *David B. Lunsford*

R. Dean Hartley (WV Bar #1619)
Mark R. Staun (WV Bar #5728)
David B. Lunsford (WV Bar #12555)
**HARTLEY & O'BRIEN, PLLC**
The Wagner Building
2001 Main Street, Suite 600
Wheeling, West Virginia 26003
Phone: (304) 233-0777
Fax: (304) 233-0774
*Counsel for Plaintiff*